NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ASHLEY S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, L.H., *Appellees*.

No. 1 CA-JV 22-0121
FILED 11-1-2022

Appeal from the Superior Court in Maricopa County
No. JD 39194
The Honorable Christopher Whitten, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Michelle R. Nimmo
*Counsel for Appellee, Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

_____

**B R O W N**, Judge:

¶1　　　　　Ashley S. ("Mother") appeals the juvenile court's order terminating her parental rights to her daughter L.H., born in 2016.　For reasons that follow, we affirm.

### BACKGROUND

¶2　　　　　Mother and Carlos H. ("Father") are L.H.'s biological parents. Although Father's rights were also terminated, he is not a party to this appeal.

¶3　　　　　The Arizona Department of Child Safety ("DCS") first became involved with this family in 2016, when L.H. was born premature and tested positive for methadone.　In 2019, DCS received a report of domestic violence.　Mother said that Father grabbed her hair and hit her in the face, and that in an earlier instance he had slammed her face into some drawers. Mother reported that Father drinks alcohol and uses cocaine.　DCS also observed that L.H. had "concerning behaviors" indicative of sexual abuse. DCS offered family preservation services, but neither parent participated.

¶4　　　　　Early in 2020, Mother was hospitalized after having a miscarriage.　Father dropped L.H. off at the hospital to be supervised by Mother while he was at work.　Hospital staff observed that Mother was dozing off and L.H. was not able to wake her up even after she slapped Mother across the face twice.　Mother nodded off before the staff could administer her methadone dosage.

¶5　　　　　Soon thereafter, DCS removed L.H. from the home and filed a dependency petition as to both parents.　DCS alleged in part that (1) Mother had a history of heroin use and had been taking methadone for the past 15 years; (2) she had untreated mental-health issues of PTSD, depression, and anxiety; and (3) there was a history of domestic violence between Mother and Father.　After Mother pled no contest, L.H. was adjudicated dependent in April 2020.　The court approved a case plan of family reunification and DCS offered Mother various services, including

substance-abuse assessment and treatment, psychological and psychiatric evaluations, individual counseling, parent-aide services, and supervised visitation.

¶6        Mother was assessed for substance-abuse treatment by TERROS but was not referred for further services because she was already engaged in services with Community Medical Services ("CMS") and was being treated with methadone. She participated in drug testing through PSI from March 2020 through July 2020, testing positive each time for methadone and seven times for benzodiazepines (anti-anxiety medication, hereinafter referred to generally as "Xanax"). Although some confusion existed between DCS caseworkers about when and where Mother should receive testing, after September 2020 she received regular testing through CMS and consistently tested positive for methadone and Xanax. In July 2021, Mother was denied her methadone dosage at CMS because she appeared impaired. Two months later she tested positive for cocaine, but claimed it was a false positive due to her use of lidocaine.

¶7        The record is not clear on what prescriptions Mother was taking. In 2019, a DCS employee reported that Mother was buying Xanax "off the streets" because her physicians stopped prescribing it after her miscarriage. DCS progress reports from 2021 noted multiple times that there was no prescription on file with DCS for Xanax even though it had been requested during the dependency.

¶8        After a psychological evaluation, a psychiatrist evaluated Mother in August 2020 and recommended she taper off Xanax given the risks of combining methadone and Xanax. According to CMS reports, those risks include respiratory depression, overdose, and death. After a follow-up appointment, the psychiatrist noted that Mother was not willing to taper off Xanax. Mother also participated in individual counseling sessions for about a year, starting in July 2020. The therapist noted that Mother had "trouble keeping up with her therapy goals."

¶9        Although Mother consistently attended visits and skill sessions, the first parent-aide service closed unsuccessfully. The parent aide concluded that Mother had not increased her abilities to parent L.H. and was still working on her mental health. DCS was also concerned that L.H. did not want to use the restroom when Mother was in the home, and that Mother would nod off during her visits with L.H.

¶10        Mother was referred again for the parent-aide program and successfully completed it in November 2021. The parent aide reported that

Mother participated in visits and skills sessions and enhanced her capacities. However, before the program closed, L.H. reported that Mother had touched her inappropriately during a supervised visit. The court then ordered for in-person visitations to stop and permitted virtual visitations only.

¶11 Throughout the dependency, Mother and Father have lived together. Mother is unemployed and relies on Father for housing and income. Father completed a substance-abuse assessment and was diagnosed with mild cocaine-use disorder. He did not engage in any reunification services.

¶12 In November 2021, DCS moved to terminate Mother's parental rights to L.H. based on nine months' and fifteen months' time-in-care. After a two-day termination hearing, the juvenile court granted the motion on both grounds and found that termination was in L.H.'s best interests. Mother timely appealed and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶13 Before the juvenile court can terminate parental rights, DCS must prove (1) by clear and convincing evidence at least one statutory ground in A.R.S. § 8-533 and (2) by a preponderance of the evidence that the termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016). "We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579, ¶ 10 (2021). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). If clear and convincing evidence supports any one ground for terminating parental rights, we need not address whether sufficient evidence supports the other grounds. *Id.* at ¶ 3.

¶14 To meet its burden of proving the fifteen months' ground, DCS was required to prove (1) it made a "diligent effort to provide appropriate reunification services"; (2) L.H. was in an out-of-home placement for a cumulative period of fifteen months or longer; (3) Mother did not remedy the circumstances requiring the out-of-home placement; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Mother challenges only the third and

fourth requirements. She does not argue the court erred in finding that termination is in L.H.'s best interests.

¶15 The juvenile court found that Mother failed to remedy the circumstances that contributed to L.H.'s removal from the home, which included "domestic violence between the parents," Mother's "unmanaged mental health issues," her "failure to protect [L.H.] from Father's substance abuse," and Mother's "general inability to care for [L.H.], "exacerbated by her long-term combined use" of methadone and Xanax. The court explained that Mother did not engage in any services to address domestic violence and failed to address her dependency on methadone and Xanax, even after being warned by doctors about the dangers in combining the two drugs. The court determined that although Mother made some progress, it was not enough to show she is capable of effectively parenting L.H. in the near future.

¶16 Mother argues she "continues to address her history of illegal opiate abuse," noting her active involvement with CMS since 2012. She contends her only unusual test in September 2021 was positive for cocaine, which she claimed was based on use of an over-the-counter lidocaine ointment. Regardless of Mother's claim, it is undisputed that she takes methadone and Xanax, even after being advised by doctors of the dangers in combining those two drugs. And Mother does not contest the juvenile court's finding that she failed to provide DCS with evidence of a prescription for Xanax, despite repeated requests. Without a prescription, DCS had no evidence that Mother was legally taking Xanax. Also, DCS provided documented instances where Mother was nodding off during visits and acting strangely. She also appeared "overmedicated" when reporting to her clinic to receive her methadone treatment in at least one instance. The record confirms that Mother has been unable to resolve her substance-abuse issues.

¶17 Mother asserts she has addressed her mental-health issues through her participation in evaluations and therapy sessions. She also argues she has enhanced her protective capacities as a parent, evidenced by her successful completion of the latest parent-aide service program. She contends the juvenile court ignored all this evidence when it terminated Mother's parental rights. But we do not reweigh the evidence on appeal. *See Jesus M.*, 203 Ariz. at 282, ¶ 12.

¶18 Consistent with the juvenile court's ruling, nothing in the record supports a conclusion that Mother can provide a home environment for L.H. that would be different or improved from what it was like when

the dependency was filed. Although Mother denies any history of domestic violence, she made reports to DCS about two incidents. A DCS caseworker testified that Mother and Father were still living together, that Father was actively using cocaine, and that neither party had tried to address the domestic-violence issues in their relationship. The caseworker explained that Mother is unemployed and relies on Father for income, and that if L.H. is returned to Mother's care, L.H. would be exposed to Father's substance abuse and the parents' domestic-violence issues. Because the circumstances that led to L.H.'s removal from Mother's care essentially remain unchanged and the record shows that Mother would not be able to effectively parent in the near future, the juvenile court did not err in terminating her parental rights.

**CONCLUSION**

¶19        We affirm the juvenile court's order.



AMY M. WOOD • Clerk of the Court
FILED:    AA